**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION**

| | | |
|---|---|---|
| JAMIE N. LOCKARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:09-cv-113-TWP-TAB |
| | ) | |
| THE CITY OF LAWRENCEBURG, | ) | |
| INDIANA, BRIAN MILLER, in his Individual | ) | |
| Capacity, DEARBORN COUNTY HOSPITAL, | ) | |
| RONALD C. CHEEK, M.D., MICHAEL | ) | |
| LANNING, DEBORAH WALSTON, JOHN | ) | |
| DOE #1, JOHN DOE #2, JANE DOE #1, AND | ) | |
| JANE DOE #2 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This case raises difficult questions about the conflict between a person's right to bodily integrity and law enforcement's need to obtain evidence.  Specifically, this lawsuit stems from the involuntary catheterization of Plaintiff Jamie Lockard ("Mr. Lockard"),  administered after he had already voluntarily provided a blood sample but was either unwilling or unable to provide a urine sample to comply with a search warrant that required both samples.  Lockard has sued all parties associated with his catheterization, including Lawrenceburg Police Officer Brian Miller ("Officer Miller"), Lawrenceburg Police Officer Michael Lanning ("Officer Lanning"), the City of Lawrenceburg, Dr. Ronald Cheek ("Dr. Cheek"), Deborah Walston, R.N. ("Nurse Walston"), and the Dearborn County Hospital (collectively, "Defendants").

This matter is currently before the Court on three motions: (1) Officer Miller, Officer Lanning, and the City of Lawrenceburg's Motion for Summary Judgment ("Lawrenceburg's

Motion"); (2) Dr. Cheek, Nurse Walston, and Dearborn County Hospital's Motion for Summary Judgment (the "Hospital's Motion"); and (3) Mr. Lockard's Motion for Partial Summary Judgment ("Lockard's Motion").  For the reasons set forth below, Lawrenceburg's Motion (Dkt. 50) and the Hospital's Motion (Dkt. 53) are **GRANTED** in their entirety and Lockard's Motion (Dkt. 79) is **DENIED**.

## *Background*

At approximately 10:40 p.m. on March 13, 2009, Officer Miller pulled over Mr. Lockard after observing him driving at a high rate of speed and failing to stop at two stop signs.  While speaking with Mr. Lockard, Officer Miller detected an odor of alcohol and observed physiological signs of intoxication, such as bloodshot eyes and slurred speech.  Officer Miller began an OWI investigation, performing a series of field sobriety tests, which Mr. Lockard failed, and administering a portable breath test, which registered a reading of 0.07%.  Officer Miller then asked Mr. Lockard to submit to a chemical test after advising him of Indiana's Implied Consent Law, but Mr. Lockard refused.  Accordingly, Officer Miller arrested Mr. Lockard and applied for a search warrant.  A search warrant was issued on March 14, 2009, at 12:10 a.m. by Magistrate Kimberly Schmaltz of the Dearborn Superior Court.

Importantly, the warrant provides: "You are hereby authorized and <u>ordered</u>, in the name of the State of Indiana with the necessary and proper assistance to obtain and remove a blood *and* urine sample from Jamie N. Lockard." (emphasis added).  The warrant goes on to say that Officer Miller was "ordered to seize such sample, obtained on such search, and forward such samples for immediate analysis."  Officer Miller requested both blood and urine samples in the warrant application, in part, because he had been trained that *both* should be obtained.

2

Specifically, in November 2008, Officer Miller attended a recertification continuing education course at which Dr. Wagner, the head of the Department of Toxicology at Indiana University, told the officer that Indiana University Department of Toxicology needed samples of both urine and blood specimens when completing toxicology kits.  On this point, Officer Miller testified that the Department of Toxicology does "preliminary testing on the urine to have an idea what to test for in the blood. . .   [t]hat way they don't use the blood sample just running queries to see what may test positive in it."[1]  Moreover, the state kit from the Department of Toxicology contained vials for both blood and urine.  Finally, Officer Miller testified that because the warrant required both blood *and* urine samples, he felt obligated to obtain both, stating that "[i]t's an order from the judge . . . I'm complying with the judge's order."

After obtaining the search warrant, Officer Miller drove Mr. Lockard to Dearborn County Hospital, arriving at 12:34 a.m.  Upon arrival, Officer Miller took Mr. Lockard to the registration desk and presented the search warrant to hospital personnel. At approximately 1:05 a.m., Mr. Lockard voluntarily provided a blood sample.  Around this time, Officer Lanning arrived at the hospital to assist Officer Miller.

Officer Miller then asked Mr. Lockard to provide a urine sample.  According to Officer Miller's testimony, Mr. Lockard initially went into the bathroom but then came out and stated that he could not give a sample.  During his deposition, however, Mr. Lockard adamantly maintained that he had never entered a bathroom at the hospital, testifying that he "[n]ever stepped foot in no bathroom."  Officer Miller testified that he then asked Mr. Lockard if he

---

[1]It is worth noting that Officer Miller had requested blood and urine search warrants prior to hearing Dr. Wagner speak.  However, Officer Miller testified that Dr. Wagner's discussion "confirmed" that seeking both samples was the appropriate course of action.

needed a drink of water and repeatedly presented him with other options to help him urinate, but Mr. Lockard declined them.[2]  Officer Miller further testified that Mr. Lockard stated, "that he wasn't going to give a sample and I could do what I had to do [referring to the catheterization]." On this point, Mr. Lockard testified as follows: "I didn't refuse . . . I just said I didn't have to go right then" and, similarly, "I told him several times I didn't have to go because he scared me." In sum, for purposes of the present motions, Mr. Lockard was either unable or unwilling to provide a urine sample.[3]

In light of these circumstances, Officer Miller and/or Dr. Cheek ordered the catheterization.[4]  Dr. Cheek, in turn, told Nurse Walston to catheterize Mr. Lockard, and, at 1:29 a.m., Nurse Walston noted that Mr. Lockard was "here with police officer for a court ordered cath."  Around this time, Nurse Walston testified that she asked Mr. Lockard, "Why don't you just urinate" and he responded "Because I don't want to."

---

[2]Somewhat confusingly, Mr. Lockard testified as follows on this issue: "I told him I didn't have to go. [Officer Miller] said 'Would a glass of water help?'  I said, 'Probably not.'  I was never offered no glass of water."

[3]The parties dispute whether Mr. Lockard *refused* to provide a sample or whether he was simply *unable* to provide a sample.  Because the evidence must be viewed in the light most reasonably favorable to the non-movant, the Court will assume that Mr. Lockard was *unable* to provide a sample for purposes of Defendants' motions but that he was *unwilling* to provide a sample for purposes of Mr. Lockard's motion.  Neither position is unreasonable in light of the evidence.  On one hand,  it is perhaps unlikely that Mr. Lockard could not urinate, given his testimony that he had consumed two beers and three Pepsis that afternoon/night.  On the other hand, it is curious why Mr. Lockard would refuse a urine sample after already voluntarily submitting to a blood test.  Moreover, fear and stress can certainly manifest themselves in the form of a shy bladder, which can greatly impede a person's ability to urinate on command.  On this point, Mr. Lockard testified that he was unable to go "because [Officer Miller] had scared" him.  In the end, however, the Court's decision does not turn on this factual dispute.

[4]This is a disputed issue of fact, but regardless, it does not meaningfully affect the Court's conclusion.

4

At roughly 1:35 a.m., Officer Miller and Officer Lanning took Mr. Lockard to bed number nine in the Emergency Department; the curtains were pulled around the bed to protect Mr. Lockard's privacy; Officer Miller handcuffed Mr. Lockard to the bed; and Officer Miller and Officer Lanning grabbed Mr. Lockard's ankles in order to restrain him "so he wouldn't kick any of the nurses."  Officer Miller testified that during this time, Mr. Lockard was actively resisting the procedure.  When asked if he complied with the catheterization, Mr. Lockard testified that he was "forced into complying."  Mr. Lockard told Nurse Walston that he did not want to be catheterized.  Nonetheless, Nurse Walston pulled down Mr. Lockard's pants, exposing his genitalia, and prepared a sterile field by putting on sterile gloves and cleansing Mr. Lockard's penis with Betadine.

Nurse Walston subsequently prepared a straight size 16 Foley catheter for insertion by applying lubrication to the catheter.  She then attempted to catheterize Mr. Lockard by beginning to insert the Foley catheter into his penis.  Around this time, Mr. Lockard informed Nurse Walston that he had an enlarged prostrate. For this reason (and because she was perceiving a lack of cooperation on Mr. Lockard's part), Nurse Walston removed the Foley catheter and began preparing a Coude catheter, which is smaller and can pass through an enlarged prostrate. The procedure with the Coude catheter was completed and a urine specimen was obtained in roughly two minutes.  Mr. Lockard claims that he suffered considerable pain during the procedure, describing it as "[j]ust as if somebody would take a burning hot coal and stick it up your penis" and "worse than a toochache."  Mr. Lockard was not examined following the catheterization, and he was discharged from the Dearborn County Hospital shortly after 2:00 a.m., into the custody of the Lawrenceburg police.

5

Mr. Lockard was taken to jail and charged with OWI, OWI Refusal, and Obstruction of Justice for refusing to consent or cooperate in the catheterization.[5]  While at jail, Mr. Lockard noticed that his urine was "cloudy."  Roughly one week after the incident, on March 20, 2009, Mr. Lockard visited Dr. Lynn Eiler for problems related to burning urination.  Dr. Eiler prescribed Mr. Lockard antibiotics, which apparently cured the burning.  However, Mr. Lockard's urinalysis was negative for infection.  On June 15, 2009, Mr. Lockard again sought treatment for urination problems, this time with Dr. Samantha Wood.  Dr. Wood referred Mr. Lockard to Mr. Michael Maggio, who, on July 6, 2009, noted that Mr. Lockard's prostate "was tender consistent with clinical prostatis."  That said, it is worth noting that Dr. Michael Koch, a physician hired by defense counsel, has reviewed the relevant evidence and opined that the catheterization at issue was "atraumatic and no urologic injury occurred to [Mr. Lockard]."

On April 3, 2009, the Indiana State Department of Toxicology received Mr. Lockard's blood and urine specimens for testing purposes.  Weeks later, on April 20, 2009, Mr. Lockard entered into a plea agreement, in which he pleaded guilty to reckless driving and received a 180 day suspended sentence, 180 days of probation, a $100.00 fine, and was assessed $165.00 in court costs.  On June 23, 2009, the Department of Toxicology reported that Mr. Lockard's blood ethanol level was 54 mg/dl (or 0.05%) and his urine ethanol level was 85 mg/dl (or 0.08%).  On July 6, 2009, the Department of Toxicology reported that Mr. Lockard's blood tested positive for benzodiazepines, opiates, marijuana, oxycodone, opiods, and MDMA (i.e. ecstacy).  Mr. Lockard's urine tested positive for benzodiazepines, opiates, marijuana, oxycodone, and

_____

[5]While not relevant to this dispute, it is interesting to note that soon after the incident, the local news began covering Mr. Lockard's story.  At one point, Mr. Lockard did a three-minute interview on live television.

hydromorphine/hydrocodone.  At his deposition, Mr. Lockard described these results as "bogus," "trumped up," and "fantasy land."  Additional facts are added below as needed.

### Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted).  "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

Here, the Court is faced with cross-motions for summary judgment.  However, these motions are not subject to a unique standard.  "In such situations, courts must consider each

party's motion individually to determine if that party has satisfied the summary judgment standard." *Tippecanoe Associates, LLC v. OfficeMax North America, Inc*., 2009 WL 798745, at *3 (S.D. Ind. March 20, 2009) (citation and internal quotations omitted).

### *Discussion*

Mr. Lockard has brought both federal and state claims against Defendants.  These claims are addressed in turn.

**A.    State Claims**

All of Mr. Lockard's state law claims falter for the same reason: He failed to comply with the Indiana Tort Claims Act when he failed to file a tort claim notice on any of the defendants . *See* Ind. Code § 34-13-3-8(a).  For this reason, both Lawrenceburg's Motion and the Hospital's Motion are **GRANTED** as to Mr. Lockard's state law claims.

**B.    Federal Claims**

Mr. Lockard's federal claims are brought under 42 U.S.C. §1983.  While not itself a source of substantive rights, §1983 instead provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterrey v. Del Monte Dunes at Monterrey, Ltd.*, 526 U.S. 687, 749 n. 9 (1999) (citation and internal quotations omitted). To prevail on § 1983 claim, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (citation omitted).

### *1.    Monell* **Claims**

Mr. Lockard has sued two entities in this matter: The City of Lawrenceburg and

Dearborn County Hospital.  A government entity is responsible under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . .". *Monell v. Dep't. of Social Servs. of New York*, 436 U.S. 658, 694 (1978). A municipality cannot be held liable solely on the grounds of *respondeat superior*. *Id.* at 691. In order to hold an entity liable, there must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well settled as to constitute a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused the constitutional injury. *See Wragg v. Village of Thornton*, 604 F.3d 464, 467-68 (7th Cir. 2010).  Here, by failing to respond to Defendants' arguments, Mr. Lockard tacitly concedes that there is no evidence to support a *Monell* claim against either the City of Lawrenceburg or the Dearborn County Hospital.  Accordingly, both the City of Lawrenceburg's Motion and Dearborn County Hospital's Motion are **GRANTED** as to Mr. Lockard's *Monell* claims.

### 2.    *Fourth/Fourteenth Amendment Claims*

The individual Defendants make numerous arguments in favor of summary judgment on Mr. Lockard's Fourth/Fourteenth Amendment claims.[6]  However, because it is dispositive, the Court's analysis begins and ends with the doctrine of qualified immunity.[7]

---

[6]The Fourth Amendment applies to the states via the Fourteenth Amendment.

[7]Defendants also argued that they are entitled to quasi-judicial absolute immunity because they were acting at the specific direction of a valid state court order (i.e. the search warrant).  Defendants ostensibly have some support for this position. *See, e.g., Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238-39 (7th Cir. 1986) (sheriff enjoyed quasi-judicial absolute immunity when, in the process of enforcing a money judgment entered by the court, he

a.     **Qualified Immunity Principles**

The applicability of qualified immunity is determined by a two-part inquiry established in

*Saucier v. Katz*, 533 U.S. 194 (2001).  First, the court "must consider . . . this threshold question:

Taken in the light most favorable to the party asserting the injury, do the facts alleged show the

officer's conduct violated a constitutional right?" *Id*. at 201.  Second, the Court must decide

whether the right at issue was "clearly established" at the time of the officer's alleged

misconduct. *Id*.  The answer to both *Saucier* questions must be in the affirmative in order for

plaintiff to defeat an officer's motion for summary judgment on qualified immunity grounds.

*Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002).

*Saucier* mandated a two-step sequence in which the first inquiry had to be answered

before the second. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Simply stated, many courts

did not like this rigidity; some voiced criticism of the rule, while others eschewed it altogether.

*Id*. at 234-35.  Consequently, the Supreme Court revisited and loosened the *Saucier* mandate

through *Pearson*. *Id*. at 227.  Now, the Court need not resolve the two inquiries in a sequential

fashion and is free to address the second inquiry before the first. *Id*. at 236 ("The judges of the

district courts and the courts of appeals should be permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand.").

Here, the Court finds the second qualified immunity prong dispositive.  Specifically, this

_____

wrongfully entered home, seized non-exempt personal property, and sold it at a public auction).
Importantly, however, the doctrine of quasi-judicial immunity does not apply to the execution of
a search warrant, which is "always subject to judicial review for unreasonableness." *Irwin v. City
of Lawrenceburg, Indiana*, 693 F. Supp. 2d 846, 854 (S.D. Ind. 2010) (citing *Dalia v. United
States*, 441 U.S. 238, 258 (1979)).

inquiry – whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct – "must be undertaken in light of the specific context of the case, not as a broad general proposition. . .". *Saucier*, 533 U.S. at 201.  For the right to be *clearly established*, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (citation and internal quotations omitted). Thus, as long as "officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Wagner v. Washington County*, 493 F.3d 833, 837 (7th Cir. 2007) (citations and internal quotations omitted).

**b.      Summary of Applicable Fourth Amendment Case Law**

Before applying these qualified immunity principles, the Court believes it would be instructive to review the *right* at issue by briefly tracing the evolution of Fourth Amendment law, especially the jurisprudence governing searches that concern bodily integrity.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched and the person or things to be seized." U.S. CONST. amend. IV.  The touchstone of Fourth Amendment analysis is "reasonableness." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).  Specifically, when analyzing conduct under the Fourth Amendment, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 296 (1989) (citation and internal quotations omitted). Importantly, this basic "reasonableness" analysis also governs the method of executing a warrant. *Ramirez*, 523 U.S. at 71.

11

There are two leading Supreme Court cases addressing whether the state's intrusion into a criminal suspect's body constituted a Fourth Amendment violation.  First, in *Schmerber v. California*, 384 U.S. 757 (1966), the Supreme Court held that the police did not violate the Fourth/Fourteenth Amendments when, with probable cause but without a warrant, they had a physician extract blood from a person suspected of drunk driving who had declined a breathalyzer test and objected to a blood test. *Id*. at 772.

Of course, not all intrusions into a suspect's body are permissible under the Fourth Amendment.  This point was driven home in *Winston v. Lee*, 470 U.S. 753 (1985), where the Supreme Court ruled that the State of Virginia could not compel a criminal suspect to undergo a surgical procedure to remove a bullet lodged in his chest, even though the bullet would have been helpful to the state in prosecuting the suspect for attempted robbery.  *Id*. at 767.  To that end, *Winston* emphasized that "a search for evidence of a crime may be unjustifiable if it endangers the life or health of the suspect." *Id*. at 761.  Moreover, *Winston* applied the *Schmerber* balancing test, which weighs the following factors: (1) the extent to which the procedure may threaten the safety or health of the individual; (2) the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity; and (3) the community's interest in fairly and accurately determining guilt or innocence.  *Id*. at 761-63.[8]  One upshot of *Winston* is that the "reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." *Id*. at 760.

---

[8]Here, the Court sees no need to explicitly apply the *Schmerber* balancing test, given that its ruling turns on the second qualified immunity prong.

12

Clearly, in terms of intrusiveness, a case like Mr. Lockard's – involving forced catheterization –  falls in between *Schmerber* and *Winston*.  In fact, the Seventh Circuit has expressly recognized that removing urine through the placement of a catheter is not as intrusive as the removal of a bullet, but that it is worse than a blood draw. *See Sparks v. Stutler*, 71 F.3d 259, 261 (7th Cir. 1995) ("A catheter is more intrusive than a needle but less intrusive than a scalpel, making it hard to classify the procedure under an objective reasonableness inquiry."). Further, at the time of the incident – March 13 and14, 2009 – the Seventh Circuit had addressed forced catheterizations in the context of § 1983 on two occasions.

First, in *Sparks*, cited above, prison guards found a syringe in a prisoner's (Sparks) shoe during a prison shakedown and therefore suspected him of drug use. *Id.* at 260.  Prison guards asked Sparks for a urine sample, which Sparks claimed he could not provide. *Id.* Finding his story unbelievable, the prison guards escorted Sparks to the infirmary where the prison physician placed a catheter and found that his bladder was in fact empty. *Id.*  A urine sample that Sparks provided several hours later tested positive for drugs. *Id.*

Sparks subsequently sued under § 1983, claiming that the prison guards violated his Fourth Amendment rights by using a catheter in attempt to extract urine from his bladder. *Id.* Following a bench trial, the district court judge found that, indeed, the forced catheterization violated Sparks' Fourth Amendment rights "because the prison could have waited for nature to take its course." *Id.* at 260-61.  On appeal, the Seventh Circuit reversed. *Id.* at 262.  In doing so, the Seventh Circuit did not determine whether a constitutional violation had occurred, but instead ruled that the prison guards were entitled to qualified immunity. *Id.* ("Legal uncertainty surrounding the use of invasive medical procedures in prison entitles these defendants to

13

immunity.").  In doing so, the Seventh Circuit rejected the district court's opinion that it would have been more reasonable for the defendants to wait for a natural urination. *Id*.  After all, the law is well-established that immunity does not hinge on "whether another reasonable, or more reasonable" course of action was available. *Id*. (citation and internal quotation omitted; also citing *Bell v. Wolfish*, 441 U.S. 520 559 n. 40 (1979) (the Fourth Amendment does not require the use of "less intrusive [yet] equally effective alternatives to [body] cavity inspections.")).  Finally, the Seventh Circuit acknowledged the uncertainty in this area of the law, observing, "[r]ights of all kinds are much diminished in prison – and the right ro be free of unwelcome medical procedures has an uncertain scope even for persons suspected but not yet convicted of crime." *Id*. at 261 (emphasis added).

Nine years later, in 2004, the Seventh Circuit again addressed forced catheterizations in *Sullivan v. Bornemann*, 384 F.3d 372 (7th Cir. 2004).  There, the plaintiff Sullivan was arrested for disorderly conduct. *Id*. at 373. Due to his high breathalyzer test results, the local jail refused to admit him. *Id*. To obtain clearance, two officers took Sullivan to the emergency room of a local hospital. *Id*. After Sullivan failed to voluntarily give a urine sample, the emergency room doctor ordered a catheterization, and, at the direction of medical personnel, the defendant officers physically restrained Sullivan during the procedure. *Id*.

Sullivan subsequently sued under § 1983, contending that the officers' actions violated his Fourth Amendment rights. *Id*.  The district court granted summary judgment, finding that the officers were entitled to qualified immunity, relying heavily on the "clearly established" prong. *Id*. at 373, 375.  On appeal, the Seventh Circuit affirmed, concluding that no constitutional violation had occurred. *Id*. at 377.  In its analysis, *Sullivan* narrowed the operative question: "did

14

the officers' acquiescence in the nurse's request to help her restrain Sullivan during the brief

catheterization procedure violate his rights under either the Fourth or Fourteenth Amendments?"

*Id.* at 376.  The Seventh Circuit answered "no," emphasizing that the catheterization was

performed "solely to assure Sullivan's medical well-being before he was transported to the

county jail." *Id.*  The Seventh Circuit expressed "no opinion" as to how its analysis would be

modified if, for instance, the catheterization was done to compile evidence. *Id.*  In the end, the

Seventh Circuit did not reach the clearly established prong for purposes of determining qualified

immunity. *Id.*  at 377.

Moreover, at the time of Mr. Lockard's catheterization, numerous courts outside of the

Seventh Circuit had addressed cases involving forced catheterizations.  A review of some of

these cases follows.  In *Lovett v. Boddy*, 810 F. Supp. 844 (W.D. Ky. 1993), plaintiff crashed his

car following a high speed chase with police and was rushed to the hospital. *Id.* at 845.  There, a

police officer arrested plaintiff. *Id.* Meanwhile, emergency room staff provided treatment to

stabilize plaintiff; in the process, they took blood and urine samples through catheterization for

medical testing and transferred remaining samples to the police officer. *Id.* at 845-46. The

samples revealed that plaintiff had alcohol in his system at the time of the accident. *Id.* at 846.

Plaintiff sued the police officer and a nurse under § 1983, alleging that the extraction of

blood and urine violated his constitutional rights. *Id.* at 846.  With respect to the blood test, the

district court found that no constitutional violation occurred because the officer had probable

cause to believe that plaintiff had been driving while intoxicated; the administration of the test

without a warrant was reasonable in light of the quickly-perishing nature of blood alcohol

content; and the test was performed by competent medical personnel in a medical setting. *Id.* at

15

847-48.  Notably, however, the district court recognized that the urine draw presented more difficult questions, given that a catheter involves unique risks, trauma, and pain.  *Id*. at 848. Moreover, although a urine test is a highly effective means for identifying the presence of alcohol, its necessity diminished once the police obtained a blood sample. *Id*.  Importantly, the district court stated that the Fourth Amendment's protection of "human dignity and privacy" might require "a warrant at the very least before government officials could compel a citizen to undergo a catheterization." *Id*. (quoting *Schmerber*, 384 U.S. at 770).  In the end, though, the district court did not address whether the urine draw violated the Fourth Amendment because no evidence tied the officer to the catheterization. *Id*. at 848-49. Instead, the evidence showed that the hospital doctor was entirely responsible for ordering the catheterization. *Id*.  Although the police officer observed the catheterization take place and took possession of a urine sample, no genuine issues of material fact suggested that the officer ordered that the plaintiff be subjected to a catheterization. *Id*. at 849.

In *Levine v. Roebuck*, 550 F.3d 684 (8th Cir. 2008), a state inmate claimed that a correctional officer and prison nurses violated his Fourth Amendment rights by forcing him to undergo catheterization to avoid prison discipline when he could not provide a urine sample for random drug testing. *Id*. at 685. The district court found that the officer violated plaintiff's Fourth Amendment rights because "involuntary catheterization of a 68-year-old man with a history of prostate problems, as part of a random drug screening and without suspicion, is unreasonable when other less intrusive options are available, such as keeping [plaintiff] in a room until he was able to urinate." *Id*. at 688 (quotations omitted). Nonetheless, the district court granted summary judgment in favor of defendant, relying on the "clearly established" qualified immunity prong.

*Id.*   On appeal, the Eighth Circuit found that the district court assumed a fact – that the officer ordered the catheterization – that was not supported by the record. *Id.* at 688.  Along those lines, even if the corrections officer ordered plaintiff to go to the medical unit, that officer had no contact with medical professionals and no authority to direct them to perform the procedure. *Id.* at 689. Because no evidence supported a finding that the officer was personally responsible for the catheterization, the Eighth Circuit found that the district court erred in concluding that the officer violated plaintiff's Fourth Amendment rights. *Id.*

In *Rudy v. Village of Sparta*, 990 F. Supp. 924 (W.D. Mich. 1996), police arrested plaintiff for driving under the influence and took him to the sheriff's department for a breathalyzer test. *Id.* at 926.  Because the plaintiff's attempts to blow into the breathalyzer machine were inadequate, officers obtained a search warrant to withdraw his blood. *Id.* The nurse at the sheriff's department, however, refused to draw plaintiff's blood without first receiving medical clearance. *Id.* Consequently, officers transported plaintiff to a hospital, where he was unable to provide a urine sample. *Id.* at 926-27. When nurses told plaintiff that they would forcibly catheterize him, he became combative, so the doctor ordered nurses to inject plaintiff with a sedative and obtain a urine sample to screen for possible drug abuse. *Id.* at 927. After waiting some time, a technician asked plaintiff to provide a urine sample, but he was unable to do so. *Id.*  The hospital doctor thereafter verbally ordered that plaintiff be catheterized. *Id.* Plaintiff alleged that after he noted that the search warrant said nothing about urine, an officer grabbed his arm and ordered the technician to perform the catheterization. *Id.*

Subsequently, the plaintiff sued under § 1983 alleging, among other things, that the officers violated his Fourth Amendment rights.  The district court granted summary judgment in

17

favor of the officer, finding that the hospital doctor and staff, not the officer, caused the alleged violation. *Id*. at 929. The district court stated that at most, the officer's instruction for the technician to "just do" the procedure was a "mere scintilla of evidence" that was insufficient to defeat summary judgment. *Id*.[9]

Last but not least, in *Ellis v. Cotton*, 2008 WL 4182359 (N.D. Tex. Sept. 9, 2008), the plaintiff was arrested for evading arrest after leading police on a high-speed chase. *Id*. at *1-2. Plaintiff was ultimately taken to the hospital after an officer observed that he was dazed and disoriented. *Id*. at *2.  At the hospital, the plaintiff behaved in a disorderly fashion, cursing at medical staff and kicking at paramedics. *Id*.  At the hospital, plaintiff admitted that he had recently "shot up" meth. *Id*.  Plaintiff was ultimately restrained, a catheter was placed, and shots were administered to calm him down. *Id*.  Plaintiff claimed that he subsequently "passed out" and, thereafter, blood was drawn and urine was extracted. *Id*.

Plaintiff sued under § 1983, alleging, among other things, that the forcible taking of blood and urine amounted to a Fourth Amendment violation. *Id*. at *5.  In ruling for the defendant, the Northern District of Texas reasoned that this case was "remarkably similar to *Schmerber*." *Id*. at *6.  Going further, the Court held that "[e]ven if Defendant violated Plaintiff's Fourth Amendment rights, he would still be immune from suit" because taking blood and urine samples is "a proper method of seizing evidence for a person suspected of committing an intoxication offense." *Id*. at *7-8.

---

[9]A similar conclusion was reached in *Saulsberry v. Maricopa County*, 151 F. Supp. 2d 1109 (D. Ariz. 2001).

c.        **Are the Individual Defendants Entitled to Qualified Immunity?**

Given this backdrop, the Court returns to the second prong of the qualified immunity analysis to determine whether the right at issue was "clearly established" at the time of the incident. *See Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir. 1987) (right must be "clearly established at the time the incidents occurred").  Under Seventh Circuit precedent, a violation is "clearly established" where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (citation omitted).  Finally, the plaintiff bears the burden of demonstrating the violation of a clearly established right. *Forman v. Richmond Police Dept.*, 104 F.3d 950, 957-58 (7th Cir.1997) (citations omitted).

Beginning with the first method of showing the existence of a "clearly established" right, the Court simply cannot find that, at the time of Mr. Lockard's catheterization, a closely analogous case established that any of the individual Defendants' conduct was unconstitutional. To the contrary, Seventh Circuit precedent is clear that an involuntary catheterization does not automatically violate the Fourth Amendment as a matter of law, even in the absence of a warrant. *See Sparks*, 71 F.3d 648.  Significantly, here, the warrant *required* the removal of *both* blood *and* urine samples.

However, this determination is not fatal to Mr. Lockard's claim if Lockard can show that the violation was clearly established, because  the violation was so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert*, 256 F.3d at 654-55. Analogous case law is not necessarily required to show a clearly established violation, partially

19

because "in the most extreme cases, an analogous case might never arise because the existence

of the right was so clear, as a matter of the wording of a constitutional or statutory provision or

decisions in other circuits or in the state courts, that no one thought it worthwhile to litigate the

issue." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000) ("a reasonable person

would have known that it was unconstitutional to use the government's power to cause . . . the

unjustified removal of a six-year-old child from his parents in order to destroy the family, based

simply on the family's religious beliefs.").

　　　　Thus, the Court is now tasked with determining if the right at issue was so obvious that a

reasonable actor would know that Mr. Lockard's forced catheterization violated his Fourth

Amendment rights.  On this point, Mr. Lockard repeatedly contends that he does not challenge

the validity of the warrant itself, but instead the *manner in which it was executed*.  That is, Mr.

Lockard asserts the  Defendants improperly *executed* the search warrant when they resorted to

forced catheterization, as the warrant did not expressly order or refer to catheterization. (*See,*

*e.g.,* Dkt. 80 at 24-25).

　　　　The Court respectfully disagrees.  To assess Mr. Lockard's arguments, the Court again

returns to the facts of this case.  A neutral and detached magistrate issued a valid search warrant,

which stated as follows: "You are hereby authorized and ordered, in the name of the State of

Indiana with the necessary and proper assistance to obtain and remove a blood *and* urine sample

from Jamie N. Lockard."  In terms of obtaining Mr. Lockard's urine sample, there were really

only two realistic ways to comply with the directive of the warrant: (1) wait for the suspect to

voluntarily relieve himself; or (2) use a catheter.[10]  Significantly, it is well-settled that the Fourth

Amendment reasonableness standard does not necessarily require the employment of "alternative

less intrusive means" when executing a warrant. *U.S. v. Cherry*, 436 F.3d 769, 775 (7th Cir.

2006) (citation and internal quotations omitted); *see also Veronia Sch. Dist. 47J v. Acton*, 515

U.S. 646, 663 (1995) (the Supreme Court has "repeatedly refused to declare that only the least

intrusive search practicable can be reasonable under the Fourth Amendment"); *Dalia v. United*

*States*, 441 U.S. 238, 257 ("it is generally left to the discretion of the executing officers to

determine the details of how best to proceed with the performance of a search authorized by

warrant – subject of course to the general Fourth Amendment protection against unreasonable

searches"); *United States v. Leon*, 468 U.S. 897, 921 (1984) (providing an officer's reliance on a

search warrant is presumptively reasonable and explaining that "an officer cannot be expected to

question the [judge's] probable cause determination . . . [o]nce the warrant issues, there is

literally nothing more the policeman can do in seeking to comply with the law, and penalizing

the officer for the magistrate's error, rather than his own, cannot logically contribute to the

deterrence of Fourth Amendment violations").  Moreover, the Seventh Circuit has expressly

rejected the notion that, when collecting a urine sample, the only reasonable course of action is

to wait for the levies to break, so to speak. *See Sparks*, 71 F.3d at 262.

      Further, the use of the word "remove" in the warrant authorizes the forcible taking of

---

[10]Defendants emphasize that more invasive procedures were not considered or ordered, "such as the use of a nephrostomy tube or a cystostomy tube for removing urine directly from the kidney or bladder," which "would have involved incisions into the skin and those respective organs." (Dkt. 92 at 4).  Obviously, barring some extenuating circumstances that the Court cannot imagine at this time, the use of these incredibly invasive procedures in lieu of a catheter to obtain a urine sample would be absurd.

urine in the absence of consent.  In the Court's view, the warrant's language obviously

contemplated the potential use of a catheter, a common and well-accepted medical procedure,

even though the warrant did not use that exact word.  On this point, "[n]othing in the language of

the Constitution or in this Court's decisions interpreting that language suggests that . . . search

warrants . . . must include a specification of the precise manner in which they are to be

executed." *Dalia*, 441 U.S. at 257-58.  And, as a practical matter, the need for a catheter may be

especially acute in OWI cases like this one, where, quite literally, the evidence dissipates by the

minute.  Ultimately, where a search warrant specifically orders a urine sample, but the suspect

will not or simply cannot urinate, then a catheter can be a reasonable means of effectuating the

requirements of the warrant.

    Additionally, the evidence shows that the catheterization itself was performed in a

reasonable manner.  By all accounts, Mr. Lockard' catheterization was carried out by medical

professionals in a hospital setting according to accepted medical practices.  As the *Schmerber*

Court emphasized, "[w]e are thus not presented with the serious questions which would arise if a

search involving use of a medical technique, even of the most rudimentary sort, were made by

other than medical personnel or in other than a medical environment – for example, it were

administered by police in the privacy of a station house." *Schmerber*, 384 U.S. at 771-72.

Moreover, it is worth noting that the curtain was pulled around the bed before the procedure was

performed in order to protect Mr. Lockard's privacy.  While the Court has no illusions about the

indignity and physical pain that Mr. Lockard endured as a result of this unpleasant procedure, the

Court cannot rule that the method of effectuating the catheter was unreasonable.

    There remains one looming case that the Court must address.  Importantly, in February

22

2010 – almost one year *after* the incident in question – the Southern District of Indiana addressed

the issue of involuntary catheterization in *Elliott v. Sheriff of Rush County, Ind.*, 686 F. Supp. 2d

840 (S.D. Ind. 2010), ruling that fact issues precluded summary judgment on plaintiff's claim

that law enforcement officers violated his Fourth Amendment rights in connection with a forced

catheterization.  Mr. Lockard uses *Elliott* as the centerpiece of most of his arguments.  And with

good reason; after all, the facts of *Elliott* are, in many ways, strikingly similar to those in the

present case.

  After pulling over the plaintiff for speeding, officers suspected Mr. Elliott of DUI and

possession of marijuana. *Id*. at 849–50.  Plaintiff refused to consent to a chemical or blood test.

*Id*. at 850–51. Officers thereafter obtained a search warrant authorizing them to obtain medical

professional assistance "to obtain and remove a blood <u>or</u> urine sample from [plaintiff]" and to

use reasonable force to do so. *Id*. at 851 (emphasis added). After obtaining the warrant, officers

transported plaintiff to the hospital, where, after seeing the search warrant, the plaintiff signed a

consent form authorizing the hospital to take a blood and/or urine sample. *Id*. Thereafter,

hospital staff drew two vials of blood and provided them to police. *Id*.  Plaintiff then drank five

cups of waters in an attempt to facilitate urination, but these efforts proved fruitless. *Id*.

Consequently, the officers decided to use a catheter. *Id*. The officers handcuffed plaintiff to a

surgical table, pulled down his pants and held his legs open while a nurse inserted a catheter. *Id*.

at 851–52. The urine analysis showed the presence of THC and benzodiazepines in plaintiff's

system. *Id*. at 852.

  Plaintiff sued the officers under § 1983 for violating his Fourth Amendment rights,

alleging, among other things, that by procuring the urine sample through forced catheterization,

23

officers exceeded the scope of the search warrant and used excessive force. *Id*. at 853.

Defendants moved for summary judgment on grounds that their actions were lawful and that

qualified immunity shielded them from liability. *Id*.  The district court found that by requiring

plaintiff to give a urine sample after he had already provided a blood sample, officers exceeded

the scope of the warrant, and that the law was clearly established that a law enforcement officer

may not exceed the scope of a lawfully obtained search warrant unless an exception to the

warrant requirement applied. *Id*. at 856-57.  This Court wholeheartedly agrees with *Elliot*'s

conclusion on this front, as the language of the warrant unmistakably limited its reach to either a

blood **or** urine sample.

Going further, *Elliott* found  assuming *arguendo* that officers if had not exceed the scope

of the search warrant, they still violated plaintiff's Fourth Amendment rights by requiring him to

undergo a forced catheterization. *Id*. at 857–62.  To reach this conclusion, the court balanced the

*Schmerber* factors and concluded that balance of the factors weighed in finding a Fourth

Amendment violation.  *Id*.  Then, with respect to defendants' claim of qualified immunity, the

district court first acknowledged that it was unable to find any on-point authority that would

create a "clearly established" right, but then ruled that "[t]his case falls into the obvious category

[because a] reasonable law enforcement officer should have known that ordering Plaintiff to

submit to a medical catheterization against his will and without the issuance of a search warrant

specifically authorizing the same, was an unreasonable search." *Id*. at 863.

Mr. Lockard's reliance on *Elliott* is certainly understandable, but, in the end, the Court is

not persuaded.  As an initial matter, it is important to note that within the Seventh Circuit, "a

district judge's decision has no precedential authority and, therefore, is not binding on other

24

courts, on other judges in the district, or even on other cases before the same judge." *Hicklin v. WBH Evansville, Inc.*, 2001 WL 1708827 (S.D. Ind. Dec. 14, 2001) (citing, *inter alia*, *Howard v. Wal Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998)).  Moreover, the Court respectfully disagrees as it believes this case is distinguishable with three portions of the qualified immunity analysis found in *Elliott*.

First, *Elliott* ruled that a "reasonable law enforcement officer should have known that ordering Plaintiff to submit to a medical catheterization against his will and without the <u>issuance of a search warrant specifically authorizing the same</u>, was an unreasonable search." *Elliott*, 686 F. Supp. 2d  at 863 (emphasis added).  In the present case, however, the search warrant implicitly authorized the use of a catheter, as the warrant *ordered* the officers to "<u>obtain and remove a blood *and* urine sample from Jamie N. Lockard</u>."  As discussed above, a urine sample can only be realistically obtained in two ways, and a catheterization is one reasonable way when a suspect is either unable or unwilling to urinate.

Second, *Elliott* distinguishes the Seventh Circuit's decision in *Sparks*, 71 F.3d 648 by highlighting that "the plaintiff was a prison inmate at the time of the search of his person" and noting that prison inmates have a lesser expectation of privacy than others in society. *Elliott*, 686 F. Supp. 2d  at 863.  This is certainly true, but, to some degree, this analysis paints an incomplete picture.  After all, the Seventh Circuit has recognized that where, as here, a suspect is arrested, his reasonable expectation of privacy is "diminished substantially . . .". *Sullivan*, 384 F.2d at 377.  Stated differently, although an arrestee may have a larger expectation of privacy than a prisoner, the arrestee's expectation of privacy is still shrunken compared to society at large.

Finally, *Elliott*, cited a "trend in the case law," which led it to believe that "the

25

recognition of controlling precedent was merely a question of time." *Elliott*, 686 F. Supp. 2d at

863 (citation and internal quotations omitted).  To bolster this position, *Elliott* relied on six

cases.  However, in the Court's view, at three of these cases are readily distinguishable because

they involved procedures that are far more invasive than catheterization. *See Rochin v.*

*California*, 342 U.S. 165 (1952) (suppressing evidence obtained when the police had the

defendant's stomach pumped to retrieve capsules that they could not forcibly extract from his

mouth); *Winston*, 470 U.S. 753 (compelled surgical removal of a bullet to be used as evidence

was not reasonable under the Fourth Amendment); *Adams v. State*, 299 N.E.2d 834 (Ind. 1973)

(subjecting robbery suspect to a surgical procedure to extract a bullet pursuant to a valid search

warrant was unreasonable under the Fourth Amendment).  Moreover, one of the cited cases did

not really tilt in plaintiff's favor. *See Schmerber*, 384 U.S. 757 (a state may, over a suspect's

protests, have a physician extract blood from a person suspected of drunk driving without

violating the suspect's Fourth Amendment rights)

  The other two cases relied on by the *Elliott* court – *Lovett*, 810 F. Supp. 844 and *Levine*,

550 F.3d 684, both of which were summarized above – involved forced catheterizations, but are

otherwise distinguishable. *Lovett* involved the warrantless withdrawal of urine and specifically

noted that "the Fourth Amendment's protection of human dignity and privacy might require a

warrant at the very least before government officials could compel a citizen to undergo a

catheterization." 810 F. Supp. at 848 (citation and internal quotations omitted).  Here, there was

such a warrant.  In *Levine*, the Eighth Circuit ultimately ruled that prison nurses' actions in

attempting to catheterize an inmate in order to obtain a urine sample for random drug testing

were objectively reasonable. 550 F.3d at 689.  Once again, *Levine* did not involve a warrant

requiring the removal of a urine sample.  Simply stated, because of the specific warrant

distinction, this Court cannot discern the same trend in the case law that was highlighted in

*Elliott*.

On this point, it is worth noting that there are at least two *post-Elliott* cases granting

qualified immunity in the context of forced catheterizations. *See Miller v. Idaho State Patrol*,

252 P.3d 1274, 1287 (Idaho 2011) (officer entitled to qualified immunity after DUI suspect was

catheterized <u>without a warrant</u> after he refused to provide a urine sample following his arrest;

"[g]iven the foregoing legal uncertainty as to whether a forced warrantless catheterization is

constitutional, the district court should have dismissed Miller's § 1983 claim under the doctrine

of qualified immunity."); and *Hooper v. Pearson*, 2010 WL 2990809 (D. Utah July 26, 2010) (no

Fourth Amendment violation involving excessive force where DUI arrestee was involuntarily

catheterized pursuant to a warrant for seizure of bodily fluids; even if forced catheterization was

not objectively reasonable, the individual defendants would still be entitled to qualified

immunity).  That said, in one recent case, *Cook v. Olathe Medical Center, Inc.*, 773 F. Supp. 2d

990 (D. Kan. 2011), the district court ruled that qualified immunity was inappropriate in the

context of a forced catheterization under the unique circumstances. *Id*. at 1012 ("the law is

clearly established that a reasonable officer would have known that absent probable cause and

exigent circumstances, [a forced catheterization] constitutes an unreasonable search under the

Fourth Amendment.").  Significantly, however, the officers in the *Cook* case did not have a

warrant authorizing the removal of a urine sample.  In any event, given these developments, the

existence and/or direction of any discernable trend in the law concerning forcible

catheterizations is far from clear.

27

In light of this somewhat diverging patchwork of well-reasoned cases, the Court cannot help but find that the individual Defendants are entitled to qualified immunity shielding them from liability.  This case is in nebulous territory. *See Sparks*, 71 F.3d at 261 ("the right ro be free of unwelcome medical procedures has an uncertain scope even for persons suspected but not yet convicted of crime").  Under the doctrine of qualified immunity, "officials are not liable for bad guesses in gray areas: they are liable for transgressing bright lines." *Gordon v. Whitted*, 2005 WL 1290644, at *10 (N.D. Ind. May 27, 2005) (citations and internal quotations omitted). Because this case is in a quintessential "gray area," the conclusion is inescapable: The individual Defendants are entitled to qualified immunity.

The Court would be remiss not to mention one last point of emphasis.  Under these circumstances, the argument for applying qualified immunity to Dr. Cheeks and Nurse Walston is particularly strong.  These individuals knew that a court, through a search warrant, had ordered the removal of a urine sample.  Common sense suggests that their corresponding use of a catheter was reasonable.  Plainly stated, doctors and nurses are not Fourth Amendment gurus. *See, e.g., United States v. Velasquez*, 469 F.2d 264, 266 (9th Cir. 1992) ("Since a physician is required to have no knowledge of the law of search and seizure to practice his profession, any such enumeration of the facts to the doctor would be a meaningless ritual . . . comparable to requiring the police to recite to a locksmith the basis for their probable cause before he could legally open a lock for them."); *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1180 (10th Cir. 2003) ("Nurses and other medical personnel have neither nor the information that would be necessary to second-guess police determinations regarding probable cause, exigent circumstances, and the like.").  Doctors and nurses are not individuals who *frequently* engage in

quintessential police activities. *Cf. Shelby Industrial Park, Inc. v. City of Shelbyville*, 2011 WL 767724, at *5 (S.D. Ind. Feb. 25, 2011) (refusing to apply relaxed standard of qualified immunity to former police officer who was acting as a private investigator during the incident; defendant was not subject to a more forgiving standard "just because he has traded his police uniform for civilian garb").  For this reason, qualified immunity is also appropriate for Dr. Cheek and Nurse Walston.

### Conclusion

For the reasons set forth below, Lawrenceburg's Motion (Dkt. 50) and the Hospital's Motion (Dkt. 53) are **GRANTED** and Lockard's Motion (Dkt. 79) is **DENIED**.  A Final Judgment will accompany this entry.


SO ORDERED:    09/06/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Steven J. Cohen**
ZEIGLER COHEN & KOCH
scohen@zcklaw.com

**Jeremy Michael Dilts**
CARSON BOXBERGER
dilts@carsonboxberger.com,diane@carsonboxberger.com

**Douglas A. Garner**
ZERBE GARNER MILLER & BLONDELL
dagarner@zerbegarnerlaw.com

**Edward J. Liptak**
CARSON BOXBERGER
liptak@carsonboxberger.com